# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FLOYDA JOHNSON-BATES,**

**Plaintiff,**

v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

**Defendant.**

**No. 14 C 3537**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Floyda Johnson-Bates filed this action seeking reversal of the final de-
cision of the Commissioner of Social Security denying her application for Disability
Insurance Benefits (DIB) under Title II of the Social Security Act (Act). 42 U.S.C. §§
405(g), 423 *et seq*, 1381 *et seq*. The parties have consented to the jurisdiction of the
United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and Plaintiff has
filed a request to reverse the ALJ's decision and remand for additional proceedings.
For the reasons stated below, the case is remanded for further proceedings con-
sistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that
he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 976-77 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on May 7, 2012, alleging she became disabled on May 7, 2012 due to a learning disability and eye problems. (R. at 76). The application was denied initially on August 31, 2012 (R. at 100), and upon reconsideration on April 22, 2013. (R. at 88, 110). Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ) on January 29, 2014, in Orland Park, Illinois. (R. at 31-74). The ALJ also heard testimony from Ronald Malik, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on March 14, 2014. (R. at 13-26). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since May 7, 2012, the alleged onset date. (R. at 15). At step two, the ALJ found that Plaintiff had the following severe impairments: depression, history of learning disability and degeneration of the lumbar spine. (R. at 16). The ALJ found Plaintiff's hypertension and diabetes were non-severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.*). The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that, as of the onset date, Plaintiff had the RFC to perform a range of medium work. (R. at 19). Based on Plaintiff's RFC and the VE's testimony, the ALJ de-

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

termined at step four that Plaintiff is capable of performing past relevant work as a packager. (R. at 24). Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined in the Act, from May 7, 2012 through the date of his decision. (R. at 26).

The Appeals Council denied Plaintiff's request for review on March 28, 2014. (R. at 1-3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (ci-

tation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

On July 10, 2012, Michael E. Stone, Psy.D., a clinical psychologist, conducted a consultative examination at the request of the Administration. (R. at 290-93). Plaintiff reported she suffers from a learning disability, depression, and eye problems;

she experiences suicidal feelings subsequent to multiple losses including the death of a child, her son being sentenced to prison for 38 years, the loss of her parents, and recent separation from her husband. She was taking no medication. (R. at 290). Dr. Stone noted she receives assistance from her daughter "with practical daily matters including cooking, shopping, travel, and money management." (R. at 291). During the examination, she was alert and oriented, her affect was flat but appropriate to content, her mood appeared dysthymic and dysphoric, she cried frequently during the evaluation, and she "exhibited problems maintaining a consistent level of attention and concentration through evaluation." (*Id.*). On the mental status examination, Plaintiff evidenced impairment in her ability to perform calculations and in her general fund of knowledge, difficulty comparing and contrasting objects, she exhibited impaired judgment and concrete thinking, and had borderline to low intelligence functioning. (R. at 293). Dr. Stone diagnosed agitated depression, learning disability, and eye problems and opined that she could not manage benefits in her own behalf due to her "emotional adjustment, learning, [and] medical difficulties." (*Id.*).

On August 2, 2012, Plaintiff had an eye consultation at Progressive Eye Care with Kathy Anderson, M.D., who noted some mild myopia and astigmatism in her right eye. She indicated glasses would help improve acuity. (R. at 297-300). Plaintiff did not return to see an eye doctor and does not wear glasses. (R. at 307).

On October 3, 2012, Plaintiff went to Aunt Martha's Health Center and lab results indicated Helicobacter pylori infection and diabetes, and she was prescribed

Metformin and Lisinopril. (R. at 301-02). On February 11, 2013, Aunt Martha's referred her for psychiatry. (R. at 304). On March 11, 2013, Plaintiff followed-up and noted her medication caused constipation and headaches, and she also reported lower back pain. (R. at 313-14). On April 15, 2013, Plaintiff returned to Aunt Martha's noting sharp pain in her chest. (R. at 311-12).

On March 30, 2013, Stanley Simon, M.D., M.P.H., a specialist in internal and occupational medicine, performed a consultative examination. (R. at 306-09). Dr. Simon noted she was able to walk half a block before experiencing leg pain and that she could stand for 20 minutes before feeling tired; she could sit for 30 minutes before needing to stand; she could lift less than 5 pounds; and she was able to climb stairs, but slowly. (R. at 307). Examination revealed tenderness of the lumbar spine. (R. at 308). Dr. Simon noted she has a history of learning disability, hypertension, diabetes, and vision problems. (R. at 309).

On July 3, 2013, Plaintiff went to Will County Community Health Center ("Will County"). (R. at 344-49). She exhibited depressed mood, difficulty concentrating, difficulty getting to sleep, worry, guilt, and suicidal ideation. (R. at 347). She was diagnosed with major depressive disorder. (*Id.*). She was also positive for back pain. (*Id.*). Examination revealed tenderness over the lumbar spine and pain that was severe with motion. (R. at 348). She was prescribed Prednisone and Cyclobenzaprine. (R. at 344). On July 12, 2013, Plaintiff went to the Emergency Department at Provena Saint Joseph Medical Center due to an adverse reaction caused by her medication. (R. at 327). Her diagnosis was possible angioedema secondary to Lis-

inopril. (*Id.*). On October 11, 2013, Plaintiff returned to Will County, presenting with a cold and cough. (R. at 340).

On January 15, 2014, Plaintiff went to Silver Cross Hospital for back pain. (R. at 365). A CT scan of the lumbar spine revealed diffuse disc bulges with accompanying impression on the thecal sacs at L3-L4, L4-L5, and L5-S1 encroachment of the bilateral neural foramina at L4-L5 secondary to disc bulge and thickening of the ligamentum flavum (*Id.*). On January 24, 2014, Aunt Martha's indicated a diagnosis of depression and trouble sleeping, and referred Plaintiff to a mental health provider. The referral noted that she was on a waiting list for a psychiatrist. (R. at 366).

### Non-Examining DDS Doctors

On July 20, 2012, the state agency psychologist found that Plaintiff had affective disorders and suffered moderate limitations in concentration, persistence, or pace, and social functioning. (R. at 92-93). The state agency psychologist also found that, with regard to sustained concentration and persistence, Plaintiff did not handle stress or changes in routine well. (R. at 96). She was limited to unskilled work and found not disabled. (R. at 98). On reconsideration, the medical consultant found Plaintiff's affective disorders, diabetes mellitus, and hypertension to be severe impairments, but ultimately found she was not disabled. (R. at 81, 86).

### Plaintiff's Testimony

Plaintiff was 55 at the time of the hearing. (R. at 39). She testified that she could lift at least 5 pounds and maybe 10 pounds (R. at 46); medication gives her side effects, such as dizziness, nervousness, and difficulty breathing, it makes her tired

and weak, and bothers her stomach (R. at 48); and she has difficulty concentrating. (R. at 50). She naps for 30 minutes at a time, 2-3 times per day; she becomes tired after walking a quarter of a mile, and she has had chronic back pain for about 15 years. (R. at 51). Her back problems were exacerbated by climbing stairs in her home and she moved in October 2013. (R. at 53).

She looked for work on her computer. (R. at 56). She watches her grandchildren, ages 5 and 7, once or twice during the weekend; she watches them for an hour or two and puts them to bed. (R. at 57). Her daughter gives her $200 a month. (R. at 58). The Will County agency operating her subsidized housing center advised her that she did not need to participate in housekeeping or grounds keeping activities that other residents are required to perform; the agency requires 8 hours of community work per month. (R. at 60). She goes to church but can't stay all day. (R. at 62). She spends her days watching television and visiting with her daughter who lives four minutes away via automobile. (R. at 61).

She began going to Aunt Martha's Health Center in 2012 because she did not have health insurance at that time, although she has a medical card now. (R. at 52-54). Aunt Martha's required a $30 fee per visit. (R. at 54). She was prescribed Prednisone and Prozac and told she has diabetes and high blood pressure. (R. at 52-53).

On June 28, 2012, Plaintiff filled out a function report (R. at 236-43) and noted that she forgets a lot, is very weak and tired, her vision is poor, and she does not understand things. (R. at 236). She prepares her own meals, drives, and does light housekeeping and laundry, but gets tired. (R. at 238-39). At that point she indicated

she could lift 10-15 pounds, can only bend a little, cannot stand very long, reaching is hard, and she gets out of breath quickly when she walks. (R. at 241). On that same date, Plaintiff's daughter, Latesha McGee, submitted a third-party function report to the Administration indicating Plaintiff "is not able to stand long, her memory has gotten worse, [she] keeps forgetting a lot [of] appointments [and] events, her back problems are worse, she has intense pain but no insurance to take care of it." (R. at 218). She also noted Plaintiff "gets tired quick [and] falls asleep w/out even knowing and will not remember what happened." (R. at 222).

On January 24, 2013, Plaintiff filled out another function report, noting side effects from medication, including drowsiness, stomach pain, diarrhea, bloody stools, and vomiting. She stated she would try to go to the doctor in the next month, but was without money at the present time. (R. at 272). She detailed that her impairments restricted her ability to lift, squat, bend, walk, sit, remember, complete tasks, concentrate, understand, and follow instructions, and she was unable to stand long enough to prepare anything other than simple meals. (R. at 267). Feelings of anxiety, fear, and worry interfered with her sleep; joint pain interfered with her ability to sit for extended periods; and being a part of a large group made her nervous. (R. at 266-70). She had trouble remembering and understanding and could not follow spoken instructions. (R. at 270). On that same date, Latesha McGee filled out a third-party function report indicating Plaintiff "is not able to stand long or walk around without getting short of breath. Her memory is getting worse[]. She can't even remember conversations she just has with someone, she has severe back pains but no

health insurance to take care of it. She recently got diagnosed with diabetes and the medication makes her sick." (R. at 256). Ms. McGee also noted that Plaintiff wakes up in the middle of the night and throws up the diabetes medication; she can perform light cleaning, washing dishes, and laundry, but needs helps; and she has to have verbal instructions repeated to her multiple times and does not follow written instructions well. (R. at 257-61).

On May 15, 2013, Plaintiff's attorney submitted a disability report indicating she is more tired and has more back pain than before; she has to go to the bathroom more often and has chest pains; and she has a lot of leg cramps. (R. at 276). She was taking Flexeril, Lisinopril, and Metformin, and noted the following side effects: drowsiness, dizziness, blurred vision, headaches, tiredness, diarrhea, gas, chest pains, indigestion, nausea all day, and upset stomach. (R. at 277).

## V. DISCUSSION

### A. The ALJ's credibility determination is patently wrong.

Plaintiff argues that the ALJ erred in his credibility determination. An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence sup-

porting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support a claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

## 1. Objective Medical Evidence

The ALJ found Plaintiff not credible as to her allegations of significant mental health difficulties. (R. at 21-22). The ALJ gave her "testimony and allegations very little weight as inconsistent with the relatively normal findings on exams" and noted "the very limited presentations and overall negative or minimal findings on exams fail to support her significant functional limitations." (*Id.*). An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano,* 556 F.3d at 562 (citing SSR 96–7p; 20 C.F.R. § 404.1529(c)(2)). Additionally, the ALJ does not explain what the "normal findings on exams" refers to, and in fact, the psychological consultative examiner and the physicians at Will County and Aunt Martha's found Plaintiff had major depressive disorder. (*See* R. at 293 (Dr. Stone diagnosed agitated depression and learning disability); R. at 347 (Will County diagnosed major depressive disorder); R. at 366 (Aunt Martha's diagnosed depression)). The ALJ simply did not build an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002.

Moreover, the ALJ noted that "the claimant was referred for a psychiatric evaluation in January of 2014 and earlier, but the medical record to date does not support such follow up or significant mental health findings." (R. at 21). Social Security Ruling 96–7p is clear that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual

may provide[.]" *See Barnes v. Colvin*, 80 F. Supp. 3d 881, 885-86 (N.D. Ill. 2015). The ALJ never asked Plaintiff to explain the reason for what he believed was insufficient treatment. *See Orienti v. Astrue*, 958 F. Supp. 2d 961, 977 (N.D. Ill. 2013) ("ALJs have a duty to consider factors like inability to travel, mental illness, or economic constraints that may have prevented claimants from seeking [or] receiving medical care."). A review of the January 2014 referral indicates that Plaintiff was in fact on a waitlist for a psychiatrist (R. at 366), an important fact omitted by the ALJ especially considering he based part of his credibility finding on her failure to follow up. The ALJ's failure here to evaluate the evidence that potentially supported Plaintiff's claim "does not provide much assurance that he adequately considered [her] case." *Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006).

## 2. Activities of Daily Living

Next, Plaintiff contends that the ALJ impermissibly assessed her credibility based on her activities of daily living. The ALJ noted:

> Inconsistent with her alleged dozing off throughout the day, the claimant does drive. She is able to go out independently. She works out. She engages in household activities, family activities, shops, cleans, attends church and watches her grandchildren. I find these activities support her ability to work and are inconsistent with her allegation of fatigue and weakness.

(R. at 23).

The ALJ found Plaintiff's testimony not credible based on her activities of daily living and concludes that her assertion of fatigue and weakness is inconsistent with her activities of daily living. The ALJ's assessment is improper.

While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly admonished ALJs not to place "undue weight" on those activities. *Moss*, 555 F.3d at 562; *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace."); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). Further, when an ALJ does analyze a claimant's daily activities, the analysis "must be done with care." *See Roddy v. Astrue,* 705 F.3d 631, 639 (7th Cir. 2013).

Here, the ALJ did not adequately explain how Plaintiff's ability to perform limited household activities undermines her credibility of fatigue and weakness. *See Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011) ("[An ALJ] must explain perceived inconsistencies between a claimant's activities and the medical evidence."). Even more concerning is that in discussing Plaintiff's daily activities, the ALJ misrepresented many of Plaintiff's limitations in performing those daily activities. With respect to babysitting her grandchildren, Plaintiff testified that the babysitting consists of watching her two grandchildren once or twice during the weekend for approximately 1-2 hours and then putting them to bed. (R. at 57). *See Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) ("But an ability to engage in 'activities of daily living' (with only mild limitations) need not translate into an ability to work full time.

. . . And the only activity of daily living to which the administrative law judge referred was babysitting, from which an ability to work full time could not be inferred."). The ALJ also notes that Plaintiff attends church, but ignores the fact that she testified she can no longer attend Sunday school and leaves after services "because I can't stay all day." (R. at 62). She prepares meals, but noted that standing too long bothers her. (R. at 267). An ALJ cannot disregard a claimant's limitations in performing household activities. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (ALJ failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week); *see also Moss*, 555 F.3d at 562 (noting the ALJ ignored numerous qualifications regarding Plaintiff's daily activities: "while washing dishes she shifts her weight to the left but still experiences pain; when she last went to the store she had to use the cart for support and was unable to stay long; and when she last tried to drive the family vehicle more than a year before the evidentiary hearing, she had difficulty pushing the pedals because of a lack of control or feeling in her foot").

Moreover, the ALJ did not consider that Plaintiff relied on family members to assist her in performing activities of daily living. Although Plaintiff noted in a January 2013 function report that she does some cleaning and laundry (R. at 267), her daughter noted that "she needs help cleaning and doing laundry." (R. at 258). Plaintiff also noted she relies on her daughter to take her to church and to remind her of her doctors' appointments. (R. at 269). Moreover, in Dr. Stone's consultative exam,

he noted Plaintiff "receives assistance from her daughter with practical daily matters including cooking, shopping, travel, and money management." (R. at 291). The ALJ ignored these limitations and did not consider how her ability to perform work activities would be similarly limited. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons [. . .], and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

### 3. Failure to Concentrate

The ALJ noted that "the clinical findings on exams were essentially unremarkable or not supportive of her significant functional limitations of problems with concentration." (R. at 19). To the contrary, Dr. Stone noted she exhibited problems maintaining a consistent level of attention and concentration. The ALJ acknowledged that Dr. Stone indicated a learning disability, but states "the claimant worked for years despite this history. The record does not support any worsening condition or significant problems in concentration." (R. at 22). Yet both state agency examiners also noted difficulties with concentration and found that Plaintiff had moderate limitations in concentration, persistence, or pace.

In support of his finding, the ALJ notes that Plaintiff "did not stop working due to medical reasons" and continued to babysit for her grandchildren. (R. at 22). The

Seventh Circuit has observed that when a claimant for disability insurance benefits works this does not necessarily mean she is not disabled: "A desperate person might force himself to work despite an illness that everyone agreed was totally disabling." *Hawkins v. First Union Corp. Long–Term Disability Plan,* 326 F.3d 914, 918 (7th Cir.2003). "Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely." *Id.*

The ALJ also discredited Plaintiff's testimony that she was unable to concentrate because she testified that she looked for jobs on a computer. The ALJ stated:

> When questioned regarding her application for unemployment benefits and looking for work, she claims that she was only looking on the computer for work. Even if she was only looking on the computer, her research on the computer for jobs is inconsistent with her allegations of extensive problems with concentration, completing tasks and focus. She had the wherewithal to take the necessary steps to look for jobs and obtain unemployment benefits.

(R. at 22).

Yet the ALJ did not inquire about her activities on the computer. Plaintiff testified that she searched for jobs using a computer (R. at 56); however, as Plaintiff notes in her brief, there is no testimony as to what this entailed or means in terms of how long she was able to search for jobs before losing focus. (Mot. at 20). The ALJ assumes that Plaintiff searched on the computer for uninterrupted periods of time and thus her allegations of difficulty concentrating are not reliable. However, an ALJ is not permitted to substitute "presumptions, speculations and suppositions" for evidence. SSR 86-8; *see also White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision

based on speculation is not supported by substantial evidence."). The ALJ did not ask Plaintiff the amount of time she spent searching for jobs, the frequency with which she searched for jobs, or the level of complexity of her search before drawing an inference that Plaintiff's level of concentration equated to one of full-time employment. The ALJ failed to explain how a job search on the computer for an unknown amount of time undermined any alleged limitations in concentration. The ALJ failed to "build an accurate and logical bridge from the evidence to [his] conclusion," *Steele*, 290 F.3d at 941 (internal quotation omitted), and improperly discredited Plaintiff's credibility by relying on improper inferences instead of substantial evidence in the record.

The ALJ also repeatedly points to a single medical record that indicates Plaintiff is negative for anxiety and depression in support of his credibility determination. (R. at 342). However, this medical record is for an October 11, 2013 appointment at Will County for an upper respiratory infection where Plaintiff presented with a cold and cough and was instructed to take cough syrup. (R. at 340). "But by cherry-picking [the medical file] to locate a single treatment note that purportedly undermines [the treating doctors' and therapists'] assessment of [the claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness." *Punzio*, 630 F.3d at 710. Indeed, despite this medical record, Plaintiff was consistently diagnosed as positive for depression. (*See* R. at 293, 347, 366).

### 4. Ability to Afford Treatment

Next, the ALJ rejected Plaintiff's allegation that she was unable to afford regular medical treatment. The ALJ found that her inability to afford medical treatment was unpersuasive, noting that she received $200 a month from her daughter, and received unemployment insurance benefits. (R. at 22-23). He also noted that she had insurance or a health card. (R. at 22). Because of this, the ALJ found that Plaintiff's statement that she could not afford the $30.00 fee for medical treatment was not credible. It is unclear how the ALJ reached this conclusion. He did not determine the amount of unemployment benefits that she received each month, and in fact Plaintiff testified that she did not have health insurance during the time she went to Aunt Martha's clinic. (R. at 52-54). Moreover, the ALJ never considered Plaintiff's expenses, including her rent payment which was $800 per month in October 2013. (R. at 117). *See Eskew v. Astrue*, 462 Fed. Appx. 613, 616 (7th Cir. 2011) (error for ALJ to dismiss claimant's "explanation for not taking prescribed medication simply by noting her ability to buy cigarettes during that time - even though the record contains no information about either the price of her medication or the cost of her cigarette habit").

## 5. Medication Side Effects

Plaintiff reported side effects when she started medication for hypertension, diabetes, and depression. On a January 24, 2013 function report, she reported taking Metformin and Lisinopril, and reported light headedness, dizziness, constipation and an inability to drive as side effects. (R. at 272). In a May 15, 2013 disability report, she indicated she takes Flexeril, Lisinopril, and Metformin, prescribed by

Aunt Martha's, and she had the following side effects: drowsiness, dizziness, blurred vision, headache, tiredness, diarrhea, gas, headaches, chest pains, indigestion, nausea all day, and upset stomach. (R. at 278). She also reported taking Prozac for depression, which causes drowsiness, confusion, and weakness, and Cyclobenzaprine for muscle pain, causing dizziness and blurred vision. (R. at 283).

On a follow-up at Aunt Martha's on March 11, 2013, she reported that the medicine caused constipation and headache. (R. at 313). On July 12, 2013, she went to Provena Saint Joseph Medical Center for an allergic reaction to Lisinopril. (R. at 328). Yet, the ALJ concluded that side effects were not supported in the treatment record and not on any ongoing basis (R. at 22), and again relies on the one medical record where Plaintiff presented for a cold and cough noting she was negative for dizziness, nausea, vomiting, chest pain, and headaches. (R. at 22; 342). It is unclear how the ALJ reached his conclusion, especially considering Plaintiff's emergency room visit for side effects, her reported side effects to Aunt Martha's, and the reported side effects on her function reports. The ALJ must accept the evidence of Plaintiff's medication side effects and incorporate them into her analysis and "explain why it was rejected." *Indoranto,* 374 F.3d at 474.

With respect to Plaintiff's testimony that she has to take 2-3 half an hour daily naps (R. at 51), the ALJ rejected this testimony stating that she "presented as alert and oriented" and "had normal psychiatric findings," again relying on the same medical record where Plaintiff reported to Will County with a cold and cough. (R. at 22). As the Seventh Circuit has explained on numerous occasions, "a person who

suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio,* 630 F.3d at 710. The fact that she requires naps 2-3 times a day is unrebutted in the record, and during the hearing the ALJ noted that napping throughout the day would preclude all employment. (R. at 71). Moreover, the VE testified that an individual who was off-task more than 15% of the workday (R. at 71) or absent more than 14-17 days per year would be precluded from competitive employment. (R. at 72). The ALJ did not consider whether these limitations would cause Plaintiff to be off-task more than 15% of the workday. In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele,* 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott,* 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination. *Moon,* 763 F.3d at 721.

**B. Summary**

Because the Court is remanding on the credibility issues, the Court chooses not to address Plaintiff's argument that the ALJ erred in his RFC determination and evaluation of the aggregate effects of Plaintiff's impairments. On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical and mental impairments

and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings [14] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: December 8, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge